**In re the DUPLAN CORPORATION and Duplan Fabrics, Inc., Debtors.**

**Nos. 76 B 1967 (KTD), 76 B 1968 (KTD).**

United States District Court,
S. D. New York.

July 31, 1978.

See also, 455 F.Supp. 926.

**934**

Shea, Gould, Climenko & Casey, New York City, for Reorganization Trustee by Lonn A. Trost, Martin I. Shelton, Peter Stergios, New York City, of counsel.

Zalkin, Rodin & Goodman, New York City, for Bank Creditors by Richard S. Toder, Richard A. Gerard, New York City, of counsel.

Curtis, Mallet-Prevost, Colt & Mosle, New York City, for Successor Indenture Trustee, United States Trust Co. of New York by John P. Campbell, Priscilla Lundin, New York City, of counsel.

William D. Moran, New York City, Regional Administrator, for Securities and Exchange Commission by Nathan Fuchs, New York City, of counsel.

Chamberlain, D'Amanda, Bauman, Chatman & Oppenheimer, Rochester, N. Y., for the Rochester Joint Bd. Amalgamated Clothing Workers of America, AFL–CIO by Michael T. Harren, Rochester, N. Y., of counsel.

## OPINION & ORDER

KEVIN THOMAS DUFFY, District Judge.

On October 5, 1977 I signed an order in this reorganization proceeding under Chapter X of the Bankruptcy Act granting the Trustee's application to approve and authorize a collective bargaining agreement entered into by and between the Rochester Button Company ("Rochester"), a subsidiary of the debtor which is also in Chapter X, and the Rochester Joint Board Amalgamated Clothing Workers of America, AFL–CIO ("the Union"). The entry of this order was opposed by the Banks [1] and the Indenture Trustee, who objected to the inclusion in the contract of Article XV D, a severance pay provision. Apparently because no testimony was taken in connection with my approval of Article XV D, an appeal from my order was filed. Thereafter, counsel for all parties entered into a stipulation, which was "So Ordered" by two Court of Appeals judges, remanding the case to me "for all purposes." To allow the objecting parties an opportunity to proffer testimony concerning Article XV D, a hearing was held on June 1, 1978. The following constitutes my findings of fact and conclusions of law.

Prior to the instant agreement, which covers the employees at three of Rochester's plants from June 1, 1977 through September 30, 1980, Rochester and the Union were parties to other collective bargaining agreements, covering the employees at the Akron plant in one contract, and at the Rochester and Wellsville plants in another. The most recently expired agreements spanned June 1, 1974 through June 1, 1977 and contained a severance pay provision with the usual run-away shop clauses and further in the Rochester/Wellsville agreement:

> D. In the event that operations of the Employer are liquidated at the Rochester or Wellsville, New York plants during the term of this Agreement, then and in that event the Employer agrees to pay such employee separated as a result of such liquidation, a sum equal to the amount he would have been paid had he not been so separated, said sum to be computed on the basis of an average work week of forty (40) hours for the remainder of the contract period.

---

1. The term "Banks" as used herein represent Chemical Bank, The First National Bank of Chicago, North Carolina National Bank and Security Pacific National Bank.

The most recently expired Akron agreement contained the following in its severance pay provision:

D.  In the event that operations in the Employer's Akron, New York plant are liquidated during the term of this Agreement, for economic reasons resulting from the decline of casein and/or through products, the Employer covenants and agrees to offer all permanent employees of the Employer employed at its Akron plant immediate employment in the Employer's Rochester or Wellsville plants. Should any permanent employee of the Employer employed at Employer's Akron plant elect not to transfer to the Employer's Rochester or Wellsville plants as provided for herein, then and in that event the Employer agrees to pay severance pay to any such employee, the amount of such severance pay to be negotiated and mutually agreed upon between the Employer and the Union.  In the event that the Employer and the Union are unable to mutually agree upon the amount of severance pay to be paid to such employees, then and in that event the amount of severance pay shall be determined by the arbitrator named in Article XIX of this Agreement and the determination of the arbitrator shall be final and binding.

Article XV D of the instant agreement appears to combine these two expired provisions.  It provides:

D.  In the event that operations of the employer are liquidated at the Rochester, Wellsville or Akron, New York plants during the term of this agreement, the following provisions shall apply:

1.  If the operations of the employer are liquidated prior to February 1, 1979 then and in that event, the employer agrees to pay each employee separated as the result of such liquidation, a sum equal to the amount he would have been paid had he not been so separated, said sum to be computed on the basis of an average work week of forty (40) hours for the remainder of the contract period.

2.  If liquidation occurs on or after February 1, 1979, the parties shall negotiate the amount of severance pay due each employee.  In the event that the Employer and the Union are unable to mutually agree upon the amount of severance pay to be paid to such employees, then and in that event, the amount of the severance pay shall be determined by an arbitrator selected from a panel proposed by the American Arbitration Association in accordance with the Association's rules and procedures and the determination of the Arbitrator shall be final and binding.  In establishing the amount of the severance pay due each employee, the Arbitrator shall consider the age and length of service of each employee and the employer's above stated intention not to liquidate its Rochester, Wellsville and Akron, New York Facilities.

In short, Article XV D includes a Rochester/Wellsville-like provision for liquidations at any of the three plants occurring prior to February 1, 1979 and an Akron-like provision for liquidations after that date.

At the summary hearing held on September 27, 1977 on the Reorganization Trustee's original application to approve the instant agreement, counsel for the Trustee stated:

Now, the trustee does admit that this is an onerous provision, it is an onerous provision and a burdensome provision; however, this is the best he could do. The union has indicated to us at every negotiation that they would strike over this, a strike which would destroy the whole entire Rochester operation.

Transcript, p. 13.  That the severance pay provision contained in Article XV D was a "strike issue," that is, if the Union did not obtain the same, the Rochester employees would strike, was confirmed by Nicholas Del Vecchio, the Union's business representative who negotiated the present and most recently expired agreements.  Mr. Del Vecchio also testified that, with respect to the Union's demands in the area of severance pay, the Union ultimately did not obtain all that it was seeking.  Although the Banks called Arthur Rosenthal, the President of Rochester, as a witness on their behalf, he

testified that he had no knowledge of the negotiations resulting in the instant agreement since at the time of the negotiations he was "competing" with Rochester. He also added that he had never negotiated a labor contract, had not read the expired agreements, and had never compared the instant agreement with other collective bargaining agreements in the button industry.

Mr. Rosenthal did indicate that he had authorized a study as to the feasibility of consolidating Rochester's three factories covered by the instant agreement and that based on his preliminary discussions with those conducting the study, "[t]he general opinion is that it is more efficient to run it under one roof than three roofs." Transcript, p. 28. Mr. Rosenthal further testified, however, that there was no present plan to close down any of the three plants, that it could not be done on an immediate basis, and that the decision to do so would take into consideration, as an economic consequence, the impact of the operation of Article XV D.

In addition to the above, evidence was adduced which reflected that notwithstanding the semi-depressed state of the button industry and the fact that Rochester incurred a substantial loss in fiscal year 1977, the operations of Rochester are expected to be profitable for the coming fiscal year.

Based on the above, the Banks and Indenture Trustee urge that Article XV D of the agreement is onerous and burdensome and as such, must be rejected. However, in so contending, they confuse a Reorganization Trustee's application for an order confirming an arm's length agreement negotiated by or on behalf of the Trustee with a request seeking rejection of an executory agreement under Section 116(1) of the Bankruptcy Act, 11 U.S.C. § 516(1). *See also* Chapter X Rule 10–606. It has been held that the theory of that provision permits the court to allow a trustee to disaffirm an executory contract on a balancing of the equities that results in a showing that it is onerous and burdensome. *See Shopmen's Local Union No. 455 v. Kevin Steel Products, Inc.,* 519 F.2d 698 (2d Cir. 1975).

Here, however, the Trustee is not seeking rejection; on the contrary, approval of the renegotiated agreements is requested. Furthermore, while much ado is made about the Trustee's concession that Article XV D is "onerous and burdensome," no similar admission was made with respect to the agreement as a whole. Indeed, neither the Banks nor the Indenture Trustee object to the approval of any other portion of the agreement, and the Securities and Exchange Commission supports confirmation of the entire agreement.

In any event, it is apparent, that by its terms, Section 116(1) is inapplicable to the instant application and that it is not an "onerous and burdensome" test that governs the instant application but rather the "business judgment" standard which controls. Applying this standard, it is apparent that the Reorganization Trustee exercised sound business judgment consistent with his obligation to conduct the business and manage the property of the debtor in renegotiating and seeking approval of the agreement, including Article XV D. The agreement is beneficial to the debtor, particularly since Rochester could not operate in the event of a strike, the possibility of which was a reality faced by the Reorganization Trustee in renegotiating the contract. Moreover, the testimony of Mr. Rosenthal, adduced by the objecting parties, indicates that the possibility of liquidation of any of the Rochester plants prior to February 1, 1979, the date after which severance pay was to be negotiated rather than fixed, or at any time prior to the termination of the agreement, is remote at best. It thus should be noted that the provisions of Article XV D which have evoked the objections of the Banks and the Indenture Trustee will by the terms of that Article expire just over seven months from the date of this opinion, that the closing of any of the Rochester Button plants would be subject to the scrutiny of this court, and that there is little likelihood that any of these plants will be shut down during the term of the Agreement. To brand the Re-

organization Trustee's act, in entering into an arm's length agreement representing a reasonable settlement of the negotiations, as other than the exercise of sound business judgment simply on the basis of speculation and conjecture is unwarranted and certainly not in the best interests of either the debtor or the creditors involved in this proceeding.

Consequently, the Trustee's application is granted; the agreement in its entirety is approved and its execution authorized.

IT IS SO ORDERED.